# NO. 17-11212

## In The United States Court Of Appeals
## For The Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee.*

vs.

JEFFREY NDUNGI SILA,

*Defendant-Appellant*,

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

## JEFFREY NDUNGI SILA'S OPENING BRIEF

NANCY B. BAROHN
405 South Presa
San Antonio, Texas 78205
(913) 302-6708
Texas Bar Number: 01796500
nbb@airmail.net

*Attorney for Mr. Jeffrey Ndungi Sila*,
*Defendant-Appellant*

-i-

# CERTIFICATE OF INTERESTED PERSONS

### *United States v. Jeffrey Ndungi Sila,*
### Appeal No. 17-11212

The undersigned counsel of record certify that the following persons, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of the case:

1. **Mr. Jeffrey Ndungi Sila** is the Defendant-Appellant.

2. **Mr. Michael Anthony Smith, Mr. Kevin B. Ross, Mr. Mr. Douglas C. Green, Sr., Mr. Ezekiel Tyson, Jr.,** and **Mr. Dimitri Dube** represented Mr. Sila at various times in the district court. **Mr. Tyson** and **Mr. Dube** represented Mr. Sila at trial.

3. **Mr. Jeffrey Sila** represented himself at his sentencing hearing, and on his *Motion for New Trial* and *Motion for Judgment of Acquittal*.

3. **Mr. Christopher Stokes** and **Mr. Sid Mody** represented the United States in the district court.

4. **Ms. Nancy B. Barohn** represents Mr. Sila in this appeal. Previously, Mr. Sila was represented on appeal **Mr. F. Clinton Brodin** and **Mr. Niles S. Illich**.

5. **Ms. Amber Grand** represents the United States in this appeal.

These representations are made so that the judges of this Circuit may evaluate

possible disqualification or recusal.

                                      *s/*  NANCY B. BAROHN
                                        NANCY B. BAROHN
                                        *Attorney for Mr. Jeffrey Ndungi Sila*

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Sila claims that: 1) the court reversibly erred in refusing to give a specific unanimity of theory instruction on Count One; 2) if Count One is reversed, Count Two is insufficient as matter of law; 3) the evidence in support of Count Three was legally insufficient; and, 4) the trial court clearly erred in determining Mr. Sila's guidelines.

Mr. Sila requests oral argument if it would be helpful to the Court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . .  iii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vii

    Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vii

    Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xiii

    Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xiii

    Other Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xiv

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xv

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xvi

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    1.    Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    2.    Procedural History of the Case . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    3.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    SUMMARY OF THE ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

## TABLE OF CONTENTS (Continued)

**Page**

ARGUMENT AND AUTHORITIES .................................. 10

I.   THE TRIAL COURT REVERSIBLY ERRED IN REFUSING SILA'S
     REQUEST FOR A JURY INSTRUCTION REQUIRING
     "UNANIMITY OF THEORY" ON COUNT ONE ................... 10

     A.   Introduction ......................................... 10

          1)   *The Government's Articulation Of Its Theory
               Of The Case* ....................................... 11

          2)   *What Conduct Constituted Stealing In Count 1?* .......... 12

          3)   *The Charge Conference* .............................. 13

          4)   *The Court's Charge* ................................ 14

     B.   The Standard Of Review ................................ 16

     D.   Argument and Authorities ................................ 16

     E.   The Trial Court's Refusal To Give A Specific Unanimity
          Instruction Was Reversible Error ......................... 24

     F.   Mr. Sila Was Harmed ................................... 26

II.  IF THIS COURT REVERSES SILA'S CONVICTION OF COUNT
     ONE, THEN THE EVIDENCE IS LEGALLY INSUFFICIENT TO
     SUPPORT HIS CONVICTION OF COUNT TWO ................. 27

     A.   Pertinent Facts ....................................... 27

     B.   The Standard Of Review ................................ 28

## TABLE OF CONTENTS (Continued)

**Page**

C.  Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

III.  SILA'S CONVICTION OF COUNT THREE MUST BE VACATED AND SET ASIDE BECAUSE NO RATIONAL TRIER OF FACT COULD FIND HIS GUILT BEYOND A REASONABLE DOUBT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

A.  Pertinent Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

1)  *The PayPal Records* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

2)  *IP Address 41.215.78.139* . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

B.  The Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

C.  Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

1)  *What Did The Governments Evidence Show?* . . . . . . . . . . . . .  37

2)  *Concert Of Action In A Criminal Enterprise As A Basis To Prove That Mr. Sila Was The Filer* . . . . . . . . . . . . . . . . . .  42

3)  *The Government's Evidence Was Legally Insufficient* . . . . . .  44

IV.  THE TRIAL COURT REVERSIBLY ERRED IN DETERMINING SILA'S GUIDELINE RANGE BECAUSE ITS DETERMINATION OF LOSS UNDER <u>U.S.S.G. § 2B1.1</u> WAS CLEARLY ERRONEOUS . . . . .  45

A.  Pertinent Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

1)  *The Offense Conduct For Counts One And Two* . . . . . . . . . .  45

## TABLE OF CONTENTS (Continued)

**Page**

    2)   *The Basis Of The Loss Computations For Counts One And Two* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

    3)   *Basis For The Loss Computation Pertaining To Count Three* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

    4)   *The Loss Computation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

    5)   *The Guideline Computation* . . . . . . . . . . . . . . . . . . . . . . . . .  48

    6)   *The Parties's Written Responses* . . . . . . . . . . . . . . . . . . . . . . .  49

    7)   *The Sentencing Hearing* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

    8)   *The Court's Findings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

  B.   The Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

  C.   Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

  D.   In Sum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1

# TABLE OF AUTHORITIES

**Cases** **Page**

*Central Bank of Denver, N.A. vs. First Interstate*
  *Bank of Denver, N.A.*, <u>511 U.S. 164</u> (1994) . . . . . . . . . . . . . . . . . . . . . . . 36

*Cobbler Nevada, LLC v. Gonzalez*, <u>901 F.3d 1142</u>
  (D.Nev. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Cupp v. McNaughten*,
  <u>414 U.S 141</u> (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*McKoy v. North Carolina*,
  <u>494 U.S. 433</u> (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Morissette v. United States*,
  <u>342 U.S. 246</u> (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,21

*Rosemond v. United States*,
  <u>572 U.S. 66</u> (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Schad v. Arizona*,
  <u>501 U.S. 624</u> (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18

*United States v. Anderson*, <u>932 F.3d 344</u>
  (5th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Anderson*,
  <u>328 US. 699</u> (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22,23

*United States v. Baytank (Houston*,
  <u>934 F.2d 599</u> (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Beros*, <u>833 F.2d 455</u>
  (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,19

# TABLE OF AUTHORITIES (Continued)

**Cases**                                                   **Page**

*United States v. Brown*, 186 F.3d 661
(5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Busacca*, 936 F.2d 232
(6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Cabrales*,
524 U.S. 1 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Camick*, 796 F.3d 1206
(10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Carbins*, 882 F.3d 557
(5th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,29

*United States v. Carreon-Palacio*,
267 F.3d 381 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Castillo*, 732 FED. APP'X. 267
(5th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Correa-Ventura*, 6 F.3d 1070
(5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Delagarza-Villarreal*,
141 F.3d 133 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Dvorin*, 817 F.3d 438
(5th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Fairley*, 880 F.3d 198
(5th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES (Continued)

**Cases**                                                                  **Page**

*United States v. Ferguson*, 211 F.3d 878
    (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Gangi*, 880 F.3d 760
    (5th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,37

*United States v. Gentry*, 941 F.3d 767
    (5th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Gipson*, 533 F.2d 453
    (5th Cir.1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Green*, 897 F.3d 443
    (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Guido*, 554 Fed. App'x. 631
    (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Hoffman*, 901 F.3d 523
    (5th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Holley*, 942 F.2d 916
    (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25

*United States v. Kay*, 513 U.S. 461
    (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Lee,* 743 Fed. App'x. 296
    (11th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Lopez*, 484 F.3d 1186
    (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES (Continued)

**Cases**                                                                 **Page**

*United States v. Lowe*, 795 F.3d 519
    (6th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

*United States v. Magassouba*, 619 F.3d 202
    (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29,30

*United States v. Mahmood*, 820 F.3d 177
    (5th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*United States v. Martinez*, 921 F.3d 472
    (5th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,44

*United States v. McClellan*, 792 F.3d 200
    (1st Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

*United States v. McDowell*, 498 F.3d 308
    (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

*United States v. Miller*, 520 F.3d 504
    (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,26

*United States v. Moreland*, 665 F.3d 137
    (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,44

*United States v. Ntekume*, 2019 WL 4860939
    (D. Nev., October 2, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*United States v. Pettigrew*, 77 F.3d 1500
    (5th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

*United States v. Petty*, 2018 WL 461128
    (N.D. Tex. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

## TABLE OF AUTHORITIES (Continued)

**Cases**                                                                     **Page**

*United States v. Pothier*, 919 F.3d 143
    (1st Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39,40,41

*United States v. Reagan*, 596 F.3d 251
    (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Rodriguez-Moreno*,
    526 U.S. 275 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Rojas-Alvarez*, 451 F.3d 320
    (5t h Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Salazar*, 751 F.3d 326
    (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Torres*, 843 F.3d 203
    (5th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Villegas*, 494 F.3d 513
    (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Waguespack*, 935 F.3d 332
    (5th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,36

*United States v. Webster*, 162 F.3d 308
    (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Willett*, 751 F.3d 335
    (5th Cir. 2914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Williams*, 865 F.3d 1302
    (10th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES (Continued)

**Cases**                                                                 **Page**

*United States v. Winship*, <u>724 F.2d 1116</u>
    (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*United States v. Yashar*, <u>166 F.3d 873</u>
    (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*United States v. Zuniga*, <u>720 F.3d 587</u>
    (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

**Statutes**

<u>18 U.S.C § 2</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv,1,7,8,20,27,30

<u>18 U.S.C. § 641</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv,1,7,8,20,30

<u>18 U.S.C. § 1028A</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv,1,8,28

<u>18 U.S.C. § 3231</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xv

<u>18 U.S.C. § 3742</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xv

 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xv

**Rules**

Fᴇᴅ R. Cʀɪᴍ. P. 7© . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Fᴇᴅ. R. Cʀɪᴍ. P. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Fᴇᴅ. R. Cʀɪᴍ. P. 29(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

## TABLE OF AUTHORITIES (Continued)

**Other Authority**                                                    **Page**

ART. I, § III, U.S. CONST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,26

AMEND. VI, U.S. CONST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51,52,56

U.S.S.G. § 1B1.3, *Application Note 3* . . . . . . . . . . . . . . . . . . . . . . . . . . . 52,53

U.S.S.G. § 1B1.3, *Application Note 3(A)* . . . . . . . . . . . . . . . . . . . . . . . . 52,53

U.S.S.G. § 1B1.3, *Application Note 3(B)* . . . . . . . . . . . . . . . . . . . . . . . 53,54

U.S.S.G. § 1B1.3, *Application Note 3(D)* . . . . . . . . . . . . . . . . . . . . . . . . 54

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48,56

U.S.S.G. § 2B1.1(b)(1)(J) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

U.S.S.G. § 2B1.1(b)(10)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## STATEMENT OF JURISDICTION

**1.    Subject Matter Jurisdiction In The District Court.**

This case arose from the prosecution of offenses against the laws of the United States, *viz.*, violation of Title 18, United States Code §§ 2, 641, and 1028A.  The district court had jurisdiction of the case under 18 U.S.C. § 3231.

**2.    Jurisdiction In The Court Of Appeals.**

This is a direct appeal from a final decision of the U.S. District Court for the Northern District of Texas, entering judgment of conviction and imposing sentence.  This Court has jurisdiction of Sila's appeal under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file a notice of appeal with that court within 14 days after entry of either the judgment or a notice of appeal by the Government.  A notice of appeal filed after announcement of sentence, but before entry of judgment, "is treated as filed on the date of and after the entry" of judgment.  Fed. R. Crim. P. 4(b)(2).

In this case the written judgment was entered on September 21, 2018, and notice of appeal was filed five days later, on September 26, 2018.  ROA.640-648.

## ISSUES PRESENTED

I.    Whether the trial court erred in refusing Sila's request for a jury instruction requiring "unanimity of theory" on Count One.

II.   If Sila's conviction of Count One is reversed, whether Count Two must be vacated for legal insufficiency.

III.  Whether the evidence as to Count Three is legally insufficient.

IV.   Whether the trial court reversibly erred in determining Sila's sentence where the loss determination under U.S.S.G. § 2B1.1was based on evidence that was demonstrably untrue.

**STATEMENT OF THE CASE**

**1.    Nature Of The Case.**

This is a criminal appeal from Mr. Jeffrey Ndungi Sila's convictions of theft of public funds, and aggravated identity theft.

**2.    Procedural History Of The Case.**

On October 4, 2016, Sila was charged by indictment with theft of public funds, contrary to 18 U.S.C. §§ 641 and 2.  ROA.64-66. A superseding indictment was returned on November 4, 2016, which additionally charged Sila with Aggravated Identity Theft, contrary to 18 U.S.C. §§ 1028A and 2.  ROA.91-94. On April 4, 2017, a second superseding indictment was returned which charged Sila in Count Three with a second theft of public funds under 18 U.S.C. §§ 641 and 2.  ROA.116-120.

Sila pleaded not guilty to the charges.  ROA.868.   On September 25, 2017, Sila's trial commenced before, the Honorable Jane J. Boyle, a United States District Judge for the Northern District of Texas.  ROA.748.  It concluded September 27, 2017, when the jury found Sila guilty of all counts.  ROA.1312-1313.

On September 20, 2018, Sila was sentenced to a total term of  97 months' confinement, followed by two years of supervised release.  ROA.1402.  The court ordered restitution in the amount of $9,443, and $300 in mandatory special

assessments.  ROA.1403.  Written judgment was entered on September 21, 2018.

ROA.640-646.

Sila filed a timely Notice of Appeal on September 26, 2018, perfecting his

appeal to this Honorable Court.  ROA.647-648.

### 3.    Statement Of Facts.[1]

In 2016, the IRS began investigating a large-scale identity theft/stolen Treasury

check scheme which it believed was being run out of Kenya.  ROA.885.  Amjad

Qaqish, an IRS Special Agent with the Criminal Division, was tasked to work in an

undercover capacity to investigate Lydia Breaux.  ROA.885.  It was believed that

Breaux was a broker who assisted individuals in Kenya by negotiating checks in the

United States, then sending money back to Kenya. ROA.885-886.  Originally, Breaux

used bank accounts for this purpose, but Qaqish thought these might have been closed

by the time the investigation began.  ROA.886.  The operational plan was for Qaqish

to pose as the owner of several check-cashing organizations who was willing to

negotiate fraudulent checks.  ROA.886-887.

Qaqish contacted Breaux and met with her the first time in January of 2016.

ROA.887-888.  Though Breaux seemed generally receptive to Qaqish's proposal, it

took many contacts over many months to gain her trust.  ROA.887-889.  To this end,

---

[1]Additional facts, pertinent to the points of error, will be set out there.

and understanding that Breaux prepared tax returns, Qaqish paid Breaux to prepare tax returns for two of his "employees."[2] ROA.888.  As the relationship continued, Qaqish and Breaux discussed bringing checks into the United States to be negotiated. ROA.889.  Breaux talked about several checks en route to the States before one was available to be negotiated.   ROA.889-890.  At some point, Breaux told Qaqish that Jeffrey Sila had arrived from Kenya and had a large check that they needed help negotiating.  ROA.890.  According to Qaqish, he was familiar with the name, "Jeff," who he described as a target of the investigation.  ROA.890.  Qaqish described Edwin Sila as another target.  ROA.890.

Prior to any meetings, in a number of telephone calls, Qaqish and Breaux attempted to negotiate price for the sale of the check.  ROA.890-891.  While there were some loose understandings, negotiations continued up to August 1, 2016, the date Qaqish met Sila at a lunch meeting set up by Breaux at a restaurant in Dallas. ROA.891.  During lunch, the three continued to discuss the check, and the price Qaqish was willing to pay for it.  ROA.892-893.  Qaqish asked to see the check. ROA.893.  Sila left the restaurant and was gone about five minutes.  ROA.893.  When Sila returned, he showed Qaqish a picture of a United States Treasury Check on his cell phone.  ROA.893, 895-896.   Sila texted the picture to Breaux, who texted it to

---

[2] One person was non-existent; the other was another undercover agent.  ROA.888.

Qaqish.  ROA.894-895.  Some of the identifiers on the check had been blurred out.[3]
ROA.896.  After seeing the check, Qaqish lowered the price he was willing to pay, to
$48,000.  ROA.898-899.  He explained that more risk was involved with cashing a
check in this large amount, that was six months old, and had been mailed to Kenya.
ROA.898-890.  Qaqish would also need to pay another $400 to get a fictitious driver's
license, necessary to run the check through his business.  ROA.906-907.  Sila told
Qaqish that he knew someone who could create the fictitious license for $100.
ROA.907.

        No deal was made on August 1st.  ROA.907.  Sila explained that he did not
have the authority to accept the offer or negotiate price because the check belonged
to a number of people and had to be split up a number of ways, and he would need to
get approval from persons in Kenya.  ROA.899-900.

        After the meeting at the restaurant, Qaqish continued to try to negotiate price
with Breaux.  ROA.903.  Ultimately, Breaux informed Qaqish that his $48,000 offer
would be accepted.  ROA.903-904.

        On August 9, 2016, Qaqish, Breaux, and Sila met for lunch a second time at the
same restaurant.  ROA.905.  After lunch, they went outside to conduct the transaction.

_____

        [3]The check was made payable to "C.S." who was long deceased at the time the
return was filed.  ROA.1162-1164.

4

ROA.907.  Sila removed a large envelope from the passenger's side of Breaux's SUV, and handed it to Breaux.  ROA.908. Qaqish retrieved a duffle bag from the trunk of his car which contained $48,000 in cash.  ROA.908.  The three got into Qaqish's car where the money was exchanged for the Treasury check.  ROA.908-909.  There were nine bundles of money secured with colored rubber bands.  ROA.909, 936.  It was agreed that Sila would provide a driver's license, and Qaqish paid him an additional $300.  ROA.911, 916.

Qaqish requested the Social Security number and date of birth that accompanied the check.  ROA.911.  From his cell phone, Sila showed Qaqish a copy of a tax return which displayed the Social Security number.  ROA.912.  Sila pulled up another document on his cell phone which showed a date of birth.  ROA.912.  The document had been sent to Sila's cell phone by email from "Edwin Sila."  ROA.912.  Sila and Qaqish exchanged cell phone numbers, and Sila provided Qaqish with his email address.  ROA.913-914.  About two days later, Sila emailed Qaqish a fictitious Massachusetts driver's license in the name of C.S.  ROA.917-919.

Because the IRS had information that there were multiple large denomination checks in the United States or Kenya, part of Qaqish's plan in purchasing the Treasury check was to try to develop a relationship with Sila in the hope of finding the upper echelon of the organization.  ROA.904-905.  After the August 9th transaction, Sila and

5

Qaqish remained in touch. ROA.916-917. Qaqish told Sila that he was interested in an ongoing relationship, and encouraged Sila to bring more checks. ROA.916, 985-986. Though possibilities were discussed, no more checks materialized. ROA.931, 985.

On September 11, 2016, Sila was arrested at the airport in Los Angeles after booking a flight to Nairobi. ROA.1167. The case agent, Tanesha Manning, obtained a warrant for Sila's arrest, and he was arrested at the ticket counter where he was checking his bags. ROA.1167-1168. Sila had five pieces of luggage–three checked bags and two in his possession. ROA.1168-1169. Sila's passport and luggage were seized. ROA.1169, 1171-1172. Sila's passport reflected significant international travel. ROA.1172. It showed that Sila left Kenya on May 28, 2106, and arrived in United States on May 29, 2106. ROA.1172. There was no evidence that he left the country before his arrest. ROA.1173.

Warrants were obtained for the search of Sila's luggage and a number of electronic devices in his possession. ROA.1173, 1180. Cash, totaling $19,563, packaged in the same way as it had been delivered by Agent Qaqish was seized from Sila's luggage. ROA.173, 1176-1177.

## SUMMARY OF THE ARGUMENTS

### I.

### THE TRIAL COURT REVERSIBLY ERRED IN REFUSING SILA'S REQUEST FOR A JURY INSTRUCTION REQUIRING "UNANIMITY OF THEORY" ON COUNT ONE.

Count One of the second superseding indictment charged Sila under 18 U.S.C. §§ 641 and 2 with stealing, purloining and converting a Treasury check, occurring on or about August 9, 2016, in the Dallas Division of the Northern District of Texas. At trial, the Government took the position that, at some time, Sila came into possession of the Treasury check in Africa (the theft), then transported it to Dallas where he sold it to an undercover IRS agent (conversion). Based on the evidence, defense counsel asked the Court to give a special instruction on "unanimity of theory" since, in Count One, the Government relied on two events, occurring at different times, and on different continents. The Court refused.

This Court, and others, have addressed the adequacy of jury instructions to alleviate the danger of a nonunanimous verdict in a given case. This Court has explained that the danger of a nonunanimous verdict can be avoided by proper instructions.

Sila had the constitutional right to a unanimous verdict. He also had the constitutional right to be tried in the district in which the offense was committed.

## II.

### IF THIS COURT REVERSES SILA'S CONVICTION OF COUNT ONE, THEN THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT HIS CONVICTION OF COUNT TWO.

In Count Two of the second superseding indictment, Sila was charged with aggravated identity theft under 18 U.S.C. §§ 1028A and 2, based on his provision of identifying information to the undercover agent at the time of the sale of the Treasury check in Count One. As conviction of Count One is an essential predicate to conviction of Count Two, if Count One is reversed, then the evidence of Sila's guilt of Count Two is legally insufficient.

## III.

### SILA'S CONVICTION OF COUNT THREE MUST BE VACATED AND SET ASIDE BECAUSE NO RATIONAL TRIER OF FACT COULD FIND HIS GUILT BEYOND A REASONABLE DOUBT.

In Count Three, Sila was charged with aiding and abetting the theft of a tax refund electronically filed from IP address 41.215.78.139, leased to Enterprise ICT by AccessKenya Group, an Internet Service Provider in Nairobi, Kenya, in March of 2012. Based upon information input onto the return, the refund was directly deposited into a bank account owned by Lydia Breaux. After the refund was deposited, Breaux wire-transferred most of the proceeds from the D.E. return to Edwin Sila, Sila's brother.

8

The Government sought to link Sila to the IP address from PayPal records–Sila frequently logged into PayPal from this IP address.  The Government admitted that it had no direct evidence that Sila–and not someone else–filed the D.E. return.  The Government had no evidence of any connection between Sila and Lydia Breaux until 2016.  The Government had no evidence of any connection to show any criminal conduct involving Sila and his brother, Edwin, until 2016.

The Government's evidence was legally insufficient.  It asked the jury to find Sila guilty based on mere speculation, and a chain of overly attenuated inferences.

## IV.

### THE TRIAL COURT REVERSIBLY ERRED IN DETERMINING SILA'S GUIDELINE RANGE BECAUSE ITS DETERMINATION OF LOSS UNDER U.S.S.G. § 2B1.1 WAS CLEARLY ERRONEOUS.

The Government and the Probation Office contended that loss to determine Sila's offense level should be based on 213 fraudulent tax returns filed from IP address 196.207.16.154, and 105 fraudulent tax returns filed from IP address 41.215.78.139.  The Probation Officer's recommendations on loss were based on facts outside the trial record.  Sila objected that the loss should be based upon the scope of his own agreement in jointly undertaken activity–not on the acts of others.

The Court denied Sila's objections, and sentenced him on the basis of more than $4 million in intended losses from over 300 tax returns, occurring between 2011 and

9

2016. To reach this conclusion, the Court had to rely on "facts" that were demonstrably and materially false.

## ARGUMENT AND AUTHORITIES

### I.

### THE TRIAL COURT REVERSIBLY ERRED IN REFUSING SILA'S REQUEST FOR A JURY INSTRUCTION REQUIRING "UNANIMITY OF THEORY" ON COUNT ONE.

#### A.    Introduction.

Count One of the second superseding indictment charged that Sila, aided and abetted by others, stole, purloined, and converted to his use, money and property of the United States in excess of $1,000–specifically, a United States Treasury check in the amount of $76,592.86, payable to C.S.  ROA.116. The offense was alleged to have occurred on or about August 9, 2016, in the Dallas Division of the Northern District of Texas. ROA.116.  No additional facts to describe the offense conduct were alleged.

At trial, IRS internal records reflected that the C.S. tax return was filed electronically on April 21, 2015, from email address: robertdevote@yahoo.com, and from a device with an IP address of 196.207.16.154, which was received at the IRS Service Center in Martinsburg, West Virginia, that same day.[4] ROA.1006, 1012-1013, 1020.  Ten months later, on February 26, 2016, a tax refund check was issued, and was

_____

[4]*Gov't. Ex.* 27.

10

mailed to the home address listed on the C.S. return:  Post Office Box 925, Uhuru Gardens, Nairobi, Kenya.[5]  ROA.1007, 1021-1022.  On August 9, 2016, approximately five months after the tax refund check was issued, Sila sold the check to an undercover IRS agent in Dallas, Texas.  ROA.908.

### 1)    *The Government's Articulation Of Its Theory Of The Case.*

In opening statement, the Government described its case as "focus[ing] on two instances of theft of [an] income tax refund."  ROA.869.  The first instance was the C.S. Treasury check described above.  ROA.869.  Referencing the tax refund issued to D.E., charged in Count 3, the Government explained that the "second theft . . . occurred four years earlier in a very similar way".  ROA.865.  "[I]n both instances of theft," the Government explained, "this defendant acted in concert with others, including a woman named Lydia Breaux, and the defendant's own brother, Edwin Sila."  ROA.870.  Particularly, the Government stated that its evidence would prove "[t]wo crimes, four years apart, similar in nature and all committed by this defendant and others."  ROA.876.

---

[5]*Gov't. Ex.* 4.

## 2)    *What Conduct Constituted Stealing In Count One?*

Based on the evidence as it was adduced at trial, the issue arose to what specific conduct constituted the *actus reus*, or offense conduct, in Count One–did the theft of the Treasury check occur when the false tax return was generated, or when Sila possessed the check, or when Sila received money in exchange for the check? Defense counsel sought to nail down an answer in cross-examination of the Government's final witness, the case agent, Tenisha Manning:

> Q:    (Defense counsel) When did this stuff occur of this – of Court 1?
>
> A:    (Agent)  What do you mean?
>
> Q:    Meaning your evidence – or you're saying that there was a false tax return filed to generate this check for Ms. Short, right?
>
> A:    Yes.
>
> Q:    **Was that the theft, or was the theft when Mr. Sila received the cash money in exchange for the check?**
>
> A:    Are you asking me what – I'm not sure what your question is.
>
> Q:    **In your opinion, when did the theft occur?**
>
> *    *    *
>
> Q:    **In your opinion, at what point did Mr. Sila violate the law?**  (Emphasis added).

12

ROA.1187-1189.

The Government objected that the question called for a legal conclusion, and the Court agreed.  ROA.1189-1190.  The question of the specific *actus reus* which was the subject of Count One was revisited during the charge conference, and in later jury arguments.

### 3)    *The Charge Conference.*

At the charge conference, defense counsel asked the Court to give a special instruction on "unanimity of theory" on Count One since the Government advanced two theories–stealing the check and converting it to cash through the undercover sale. ROA.1205.  Counsel argued that the Court should instruct on one of these theories, but if it was going to instruct on both, then the "unanimity of theory" instruction should be given.  ROA.1205.  The Government's stated position was that it could prevail on either of these theories.  ROA.1208.  Relying on this Court's Pattern Instruction No. 1.25 (2015), defense counsel repeated the request:

> If that's the case then, Your Honor, we would request a unanimity of theory instruction which says the Government is going with two different theories and the jury needs to be unanimous as to at least one of the theories.

ROA.1207-1208.  The Government contended that the general unanimity instruction was sufficient because the charge described " to steal and knowingly convert" in the

alternative." ROA.1209. The Court agreed. ROA.1210.

The issue was revisited the following day. ROA.1231. Again, counsel pointed out that Count One alleged two theories of liability under § 641–it could be committed either by stealing or by knowing conversion of the Treasury check–and Sila was entitled to a unanimous verdict on one of the theories. ROA.1231. Though acknowledging that "unanimity of theory" was a confusing area of the law, the Court concluded that it did not apply in Sila's case and refused to give it. ROA.1231, 1234.

### 4)    *The Court's Charge.*

The Court gave the jury a single instruction as to what it needed to find with respect to the § 641 violations charged in both Counts One and Count Three:

> Counts One and Three of the second superseding indictment charge the defendant with a violation of section 641 of Title 18 of the United States Code, which provides in relevant part: Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys, or disposes of any record, voucher, money, or thing of value of the United States.
>
> For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> First:    That the money, property, or thing of value described in the second superseding indictment belonged to the United States and had a value of in excess of $1,000 at the time alleged;

14

Second:    That the defendant stole or knowingly converted such money, property, or thing of value to the defendant's own use or to the use of another; and

Third:    That the defendant did so knowing the money, property, or thing of value was not his and with the intent to deprive the owner of the use of the money, property, or thing of value.

\*    \*    \*

**To "steal" or "knowingly convert" means to wrongfully take money, property, or thing of value belonging to another with intent to deprive the owner of its use or benefit either temporarily or permanently**.    Any appreciable change of the location of the property with the intent to deprive constitutes a stealing whether or not there is an actual removal of it from the owner's premises.

No particular type of movement or carrying away is required to constitute a taking.  (Emphasis added).

ROA.1288-1290.    The terms "steal" and "knowingly convert" were defined identically as a "taking" of money or property.

The Court instructed the jury that "it is not necessary for the Government to prove that the offense was committed precisely on the date charged"; it was only required to prove beyond a reasonable doubt "that the offense was committed on a date reasonably near the date alleged . . . " ROA.421, 1286.

And, the Court gave a general unanimity instruction:

To reach a verdict, whether it is guilty or not guilty, all of you must agree.  Your verdict must be unanimous on each count

15

of the second superceding indictment.

ROA.428, 1296.  As to each count, the Verdict Form required the jury to find Mr. Sila either guilty or not guilty of the offense as charged in each count.  ROA.433, 1297.

### C.    The Standard Of Review.

A district court's refusal to give a defensive jury instruction is reviewed for abuse of discretion.  *United States v. Dvorin*, 817 F.3d 438, (5th Cir. 2016), citing *United States v. Salazar*, 751 F.3d 326, 330 (5th Cir. 2014); *see also United States v. Villegas*, 494 F.3d 513, 514 (5th Cir. 2007).

### D.    Argument And Authorities.

A criminal defendant enjoys the right to a unanimous jury verdict under the Sixth Amendment, and ART. I, § III of the United States Constitution.  The right to a unanimous verdict

> . . . "means more than a conclusory agreement that the defendant has violated the statute in question; **there is a requirement of substantial agreement as to the principle factual elements underlying the specific offense**." (citations omitted.)

*McKoy v. North Carolina*, 494 U.S. 433, 449 (1990) (BLACKMUN, concurring) (emphasis added).

To be sure, the Government is entitled to charge in a single count that an offense has been committed by more than one means.  *See* F. R. CRIM. P. 7© (a count

16

may allege that the defendant committed the offense "by one or more specified means."). Where a count alleges a single offense which may have been committed through a number of means, a general verdict is ordinarily sufficient even if the jurors do not unanimously agree upon a single means. *Schad v. Arizona*, 501 U.S. 504 U.S. 625, 632 (1991) ("We see no reason . . . why the rule that the jury need not agree as to mere means of satisfying the *actus reus* element should not apply equally to alternative means of satisfying the element of *mens rea*."); *see also United States v. Beros*, 833 F.2d 445, 460 (3d Cir. 1987)("In the routine case, a general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability."). Nonetheless, there are occasions where the "differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses"). *Schad* at 633. The Court acknowledged the difficulty of defining "what constitutes an immaterial difference as to mere means[,] and what constitutes a material difference requiring separate theories of crime to be treated as separate offenses subject to separate jury findings," ultimately concluding that the analysis could not be subject to a single test. *Id*. at 633, 637.

17

In *Schad*, the question was whether, under Arizona's first-degree murder statute, a general verdict was appropriate where *mens rea* could be established through alternate means–either premeditation or felony-murder. *Id*. at 639. Schad argued that premeditated murder and felony murder were inherently separate offenses, requiring a unanimous jury on one or the other theory. *Id*. at 630-31. The Court rejected Schad's argument, explaining that the there had been only one *actus reus*–that is, only one killing–and the element of *mens rea* under Arizona's first-degree murder law could be established under alternate theories of premeditation or felony murder. *Id*. at 639-640. Nonetheless, the Court suggested that jury instructions requiring verdict specificity may be desirable. *Id*. at 645.

This and other courts have addressed the adequacy of jury instructions in a given case to alleviate the danger of a nonunanimous verdict. *See*, *e.g.*, *United States v. Baytank (Houston)*, 934 F2d 599, 609 (5th Cir. 1991)("Thus, the complaint comes down to whether the jury instructions were sufficient, as it is clear that this aspect of a duplicity problem [danger of a nonunanimous verdict] can be cured by appropriate special instructions which, for example, inform the jury that it must unanimously agree on the specific basis (e.g. a give date or the like) on which it finds the defendant guilty under the count in question."); *accord United States v. Miller*, 520 F.3d 504, 513 at n.4 (5th Cir. 2008)(the danger of a nonunanimous jury verdict may be avoided

by proper jury instructions).  Beyond duplicity, this and other Courts recognize that a special unanimity instruction may be required upon examining the "[s]tatutory language and construction, legislative intent, historical treatment of the crimes by the courts, duplicity concerns with respect to defining the offense, and the likelihood of **jury confusion** in light of the specific facts presented."  *United States v. Correa-Ventura*, 6 F.3d 1070, 1082 (5th Cir. 1993)(emphasis added); *United States v. Beros*, *supra*, 833 F.2d at 460 (a specific unanimity instruction is not required unless "the complexity of the case, or other facts, create[]**the potential that the jury will be confused**.")(emphasis added).  In *United States v. Kay*, 513 U.S. 461, 463 (5th Cir. 2008), this Court looked to the total context of the trial–with the benefit of the arguments of counsel–in evaluating a challenge to the jury charge, relying on *Cupp v. McNaughten*, 414 U.S. 141, 146-47 (1973):

> [W]e accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.  While this does not mean that an instruction by itself may never rise to the level of constitutional error, it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge.  Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction. (Citations omitted).

Turning to Sila's case, 18 U.S.C. § 641 provides in pertinent part that:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or any department or agency thereof, or any property being made under contract for the United States or any department or agency thereof;
>
>       \*    \*    \*
>
> Shall be fined under this title or imprisoned not more than then years, or both . . . .

Title 18, United States Code § 2(a) provides that:

> Whoever commits an offense against the United States or aid, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

In *Morissette v. United States*, 342 U.S. 246, 266-67 (1951), the Supreme Court set out the history of § 641, which was enacted to consolidate crimes which previously had been the subject of separate statutes. It explained that, in enacting § 641, the codifiers sought to eliminate the "gaps and crevices [which] have separated particular crimes of this general class [larceny-type cases] and guilty men may have escaped through the breaches." *Id.* The "history of § 641 demonstrates that it was to apply to acts which constituted larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions." *Id.* at 251, n. 28. The Court pointed out that there "is a considerable

overlapping in the embezzlement, stealing, purloining and knowing conversion grouped under the statute." *Id*. at 254.

In *Morissette*, the defendant, while out hunting, loaded three tons of spent bomb cases–used for practice by the Air Force and dumped in heaps–onto his truck. *Id*. at 247-48. He took the cases to a farm where they were crushed; he later sold them for $84. *Id*. at 248. Against the backdrop of these facts, the Court explained that, "[p]robably every stealing is a conversion, but certainly not every knowing conversion is a stealing." *Id*. Thus, while "'to steal means to take away from one in lawful possession without right with the intention to keep wrongfully[,]'. . . [c]onversion may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful." *Id*. at 254 ("It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing, or purloining." *Id*. Accordingly, under § 641, "knowing conversion requires more than knowledge that the defendant was taking the property into his possession". *Id*. The person must have had knowledge of the facts–though not necessarily the law–that made the taking a conversion. *Id*. This is consistent with "the general rule of law, and the dictate of natural justice, that to constitute guilt there must be not only a wrongful act, but a

21

criminal intention. Under our system (unless in exceptional cases,) both must be found by the jury to justify a conviction for crime." *Id*. at 255; *see also United States v. Anderson*, 932 F.3d 344, 350 at n. 19 (5th Cir. 2019)("The actus reus is the guilty act, a violation if done with mens rea, the guilty mind).

Under § 641, the allowable unit of prosecution "is each individual transaction in which government money is received, even if the transaction is a part of an overarching scheme." *United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010); *United States v. Busacca*, 936 F.2d 232, 234, 239, 254 (6th Cir. 1991)(each taking of funds from an employee benefit plan constituted a separate violation of 18 U.S.C. § 664, relying on *Reagan*). A crime under § 641 is not a continuing offense. *See, e.g., United States v. Lopez*, 484 F.3d 1186, 1192 (9th Cir. 2007)("A crime is complete when each element of the crime has occurred."); *United States v. Green*, 897 F.3d 443, 449 (2d Cir. 2018)(violation of § 641 is not a continuing offense); *accord United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999); *United States v. Ntekume*, 2019 WL 4860939 at *3 (D.Nev., October 2, 2019)(conversion under § 641 is not a continuing offense).

At the same time, "the *locus delicti* [of an offense] must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cabrales*, 524 U.S. 1, 7 (1998)(quoting *United States v. Anderson*,

328 U.S. 699, 703 (1946); *see also United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)(a court must identify the conduct constituting the offense because venue is limited "to the place of the essential conduct elements of the offense.").

It is with these principles in mind that we turn to the question whether a specific unanimity instruction should have been given in Sila's case. As to Count One, the Government proved that the fraudulent tax return was electronically filed from Kenya in April of 2015. Neither the email address, the IP address, nor the address where the refund check was to be sent were linked to Sila, his brother Edwin, or Lydia Breaux. In February of 2016, approximately ten months after the return was filed, the refund check was mailed to Kenya. Obviously, someone in Kenya received the refund check, but this was not part of the Government's proof. Five months elapsed from the time the refund check was mailed in February of 2016, to the time it surfaced in August of 2016, in Dallas, Texas, and was sold by Sila and Breaux. Though Mr. Sila traveled to the United States from Kenya in late May of 2016, where the check actually was in this interval, or who possessed it prior to the sale, is unrevealed by the evidence.

In closing, the Government argued that Sila stole the Treasury check in Africa:

> Counsel asked, "When did the theft occur?" Well, the indictment alleges August the 9th. That's the day he was in possession of it. He had brought it from Africa, he had the

intent to sell it and convert it into cash.  That's stealing.  That's conversion.

ROA.1269.  And, again:

> We were able to show that that also came back from Kenya and that that check was sent to Kenya.  **And where did Mr. Sila come from to come to the United States *with that check*?  It was Kenya**.  (Emphasis added).

ROA.1243.  And further:

> In May, this defendant comes to the United States, and it's a reasonable inference that he had the check with him because the discussions were already under way.  He had already learned from Lydia Breaux there was a prospect.  And, then, **ultimately, that transaction was arranged for August 1st and August 9th**.  (Emphasis added).

ROA.1272.

The Government expressly argued that Sila committed two separate offenses in Count One occurring in different countries and months apart.  Clearly, there was a need for a special unanimity instruction here.

### E.    The Trial Court's Refusal To Give A Specific Unanimity Instruction Was Reversible Error.

This Court's decision in *United States v. Holley*, 942 F.2d 916 (5th Cir. 1991) is instructive.  There, Holley was charged with two counts of perjury–each individual count setting out three statements which the Government alleged to be perjurious.  *Id*. at 920.  In the trial court, and on appeal, Holley argued for a special unanimity

24

charge which would require the jury to be unanimous on at least one particular statement alleged in each count. *Id*. at 925, citing *United States v. Gipson*, 553 F.2d 453, 459 (5th Cir. 1977) (*reasoning rejected in Schad v. Arizona*, *supra*).

On appeal, this Court agreed, explaining that a general unanimity instruction is inadequate to protect a defendant's constitutional right to a unanimous verdict where there exists a "genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts." *Id*. at 926. Both counts of Holley's indictment alleged multiple false statements. *Id*. at 928. This Court explained that the perjury counts were duplicitous because "[t]he government was required to prove **dissimilar facts** to show the knowing falsity of each statement." *Id*. at 928 (emphasis added). The problem, this Court explained, was that the most reasonable interpretation of the court's instruction was that each juror was *individually* required to find at least one statement in each count to have been knowingly false in order to find Holley guilty–the instruction did not require that *all* jurors concur in the knowing falsity of at least one particular statement. *Id*. at 929. Thus, there was a reasonable *possibility* that the jury was not unanimous with respect to at least one statement in each count. *Id*.; *See also United States v. Fairley*, 880 F.3d 198, 212 (5th Cir. 2018) ("the elements of § 641 were confused by the government's argument, the indictment, the jury instructions, and the

verdict form"). In *United States v. Miller*, <u>520 F.3d 504, 513</u> (5th Cir. 2008), this Court found no error in the trial court's refusal to give a specific unanimity instruction because the instructions were plainly worded and clear, dovetailed with the Government's theory of the case, and squarely framed the contested issue at trial. And, in argument, the Government succinctly explained to the jury what the specific offense conduct was–the attempt to evade was the defendant's submission of the Offer in Compromise. *Id*. at 514.

In this case, the jury instruction made no distinction between theft and conversion, defining these terms in the singular as a "taking." In light of the jury charge and the Government's arguments, there is a reasonable possibility that Sila's jury was not unanimous as to the specific *actus reus* which constituted the violation of § 641 in Count One.

## F.    Mr. Sila Was Harmed.

Sila was harmed because there was a substantial risk of jury confusion based on the Government's arguments and the Court's charge. Sila was more particularly harmed because he enjoyed the additional constitutional right to be tried in the State and district where the crime was committed. *See:* <u>U.S. CONST., ART. III, § 2</u>, cl.3 ("[t]rial shall be held in the State where the said Crimes shall have been committed"); AMEND. VI, U.S. CONST. ("[i]n all criminal prosecutions, the accused shall enjoy the

26

right to . . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law.”); and F. R. Crim. P. 18 (“[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed.”).  This Court explains in *United States v. Winship*, 724 F.2d 1116, 1124 (5th Cir. 1984), that “[v]enue is an element of any offense; the prosecution always bears the burden of proving that the trial is in the same district as the crime’s commission.”); *accord United States v. Carreon-Palacio*, 267 F.3d 381, 390-91 (5th Cir. 2000).

In the face of the Government’s vigorous arguments that Sila stole the Treasury check in Africa, there is a genuine risk that one or more jurors concluded that he was guilty of Count One because he stole the Treasury check in Africa.   Thus, a special “unanimity of theory” instruction was required.

For these reasons, Sila’s conviction of Count One must be reversed.

## II.

### IF THIS COURT REVERSES SILA’S CONVICTION OF COUNT ONE, THEN THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT HIS CONVICTION OF COUNT TWO.

#### A.    Pertinent Facts.

Count Two of the second superseding indictment charged Sila with Aggravated Identity Theft pursuant to 18 U.S.C. §§ 1028A and 2.  ROA.117.  Sila was charged

27

with unlawfully using means of identification, *viz.*, the name, date of birth, and Social Security number belonging to C.S., during and in relation to the offense charged in Count One. ROA.117. As fully discussed in Point I, above, Sila provided the undercover agent with the name, date of birth, and Social Security number of C.S. on August 9, 2016.

### B.    The Standard Of Review.

Pursuant to F. R. CRIM. P. 29(a), Sila moved for judgment of acquittal at the close of the Government's case-in-chief, and at the close of all the evidence. ROA.1193-94, 1204. Sila's challenge to the sufficiency of the evidence to support Count Two is *de novo*. *United States v. Carbins*, 882 F.3d 557 562-63 (5th Cir. 2018). Under *de novo* review, this Court must determine whether, "viewing all the evidence in the light most favorable to the verdict, a rational jury could have found that the evidence established the elements of the offense beyond a reasonable doubt" *Id*. (quoting *United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016).

### C.    Argument and Authorities.

Title 18, United States Code § 1028A provides that:

> Whoever, during and in relation to any felony enumerated in subsection ©, knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of 2 years.

28

"Means of identification" includes any name, social security number, or date of birth. *Carbins* at 563; *United States v. Lee*, 743 F<small>ED</small>. A<small>PP'X</small>. 296, 299 (11th Cir. 2018) (defendant knowingly possessed other people's names, dates of birth, and social security number during and in relation to the predicate felony offense).

Commission of a predicate felony enumerated in the statute is an essential element of a § 1028A offense. *United States v. Petty*, 2018 WL 461128 at *3 (N.D. Tex. 2018)(explaining that venue properly lies for a § 1028A offense in any district in which venue lies for the predicate), citing *United States v. Magassouba*, 619 F.3d 202, 204 (2d Cir. 2010).    Where a conviction for the predicate felony is reversed, then a count for aggravated identity theft based upon the reversed predicate conviction must be reversed as well. *United States v. Williams*, 865 F.3d 1302, 1308 n.7 (10th Cir. 2017);*United States v. Camick*, 796 F.3d 1206, 12129 (10th Cir. 2015); *United States v. Guido*, 554 F<small>ED</small>. A<small>PP'X</small>. 631, 632-33 (9th Cir. 2014) ("Guido's conviction under § 1028A was predicated upon his conviction under § 641. . . . Because we reverse Guido's conviction for the predicate offense, theft of government property under § 641, we also reverse his conviction for aggravated identity theft under § 1028A.").

Should this Court reverse Sila's conviction Count One, his conviction of Count Two must be vacated for legal insufficiency.

29

## III.

**SILA'S CONVICTION OF COUNT THREE MUST BE VACATED AND SET ASIDE BECAUSE NO RATIONAL TRIER OF FACT COULD HAVE FOUND HIS GUILT BEYOND A REASONABLE DOUBT.**

### A.    Pertinent Facts.

Count Three charged Sila with theft of a $9,433.00 tax refund payable to D.E., contrary to 18 U.S.C. §§ 641 and 2.  ROA.118.  The Government contended that Sila aided and abetted the theft by electronically filing the D.E. tax return.[6]  The Government's case against Sila was largely circumstantial.

In 2012, the IRS lacked the capability to capture the email and IP address when a return was filed electronically.  ROA.1017, 1019-20, 1022-1024.  By querying IP address 41.215.78.139 into a Government database, IRS analyst Brandy Marks located an electronic record pertaining to the D.E. return.[7]  ROA.1026-1027.  The record reflected that two tax returns had been electronically filed from IP address 41.215.78.139–the D.E. return filed March 25, 2012, and a return in the name of C.D. filed three days earlier.[8]  ROA.1014-1015, 1028-1029.  Each return listed an identical refund amount–$9,443.  The same bank account and routing numbers had been input

---

[6]The 2011 D.E. tax return for income was fraudulent.  According to a death certificate, *Government's Exhibit* 35, D.E. died in 1968.  ROA.1163-64.

[7]*Gov't. Ex.* 31.

[8]*Gov't. Ex.* 31.

on each return.[9]  ROA.1015-1016.   Both tax refunds were electronically deposited

on April 4, 2012.[10]  ROA.1015-1016. The bank account and routing numbers input

on both returns were to Lydia Breaux's Rosmerta Trucking, LLC, bank account.[11]

ROA.1015-16.  On April 12, 2012, $9,402.12 was electronically wired from Breaux's

bank account to Edwin Sila.[12]  ROA.1161-1162.  Breaux spent the remainder of the

money on herself.  ROA.1161.

     **1)**    ***The PayPal Records***.

     The Government sought to prove that Sila filed the D.E. tax return by linking

him to IP address 41.215.78.139, which it did through PayPal records.  Records

Custodian Tyler Harmon described two PayPal accounts registered under the name

of Jeffrey Sila.[13]  ROA.1045-1047, 1060-1061.  The first account was opened on

November 13, 2006, and the registration page shows Sila's name, the email address,

jeffreysila@gmail.com, and a birth date of January 27, 1985.[14]  ROA.1045-1046.  The

exhibit contained a list of all addresses associated with the account–an address might

---

[9]*Gov't. Ex*. 31.

[10]*Gov't. Ex*. 45.

[11]*Gov't. Ex's*. 31 & 45.

[12]*Gov't. Ex*. 45.

[13]*Gov't. Ex's*. 36 and 40.

[14]*Gov't. Ex*. 36.

be either the account holder's, or an address to where an item was shipped.[15] ROA.1049-1050.  The exhibit contained a list of all bank accounts associated with the account.  ROA.1051-1052.  And, the exhibit included a chart documenting every IP address used to login into the account over the life of the account.[16] ROA.1055. As to each IP address, the chart showed a "First Used" and "Last Used" date, and the number of times the login was used.  ROA.1055.  There were 786 logins from this IP address– substantially more than from any other IP address used to access the account.  ROA.1056.

A second PayPal account was opened on April 17, 2018.[17] ROA.1057.  It was registered under the name of Jeffrey Sila Ndungi, with email address: jeffreysila@hotmail.com, and reflected a birth date of January 27, 1985.[18] ROA.1057, 1060-1062.  The IP address was used to login to this account 149 times. ROA.1064.

*Government's Exhibit* 41, a number of PayPal spreadsheets, contained entries showing transactions between jeffreysila@gmail.com and jeffreysila@hotmail.com.

---

[15]*Gov't. Ex.* 36.

[16]*Gov't. Ex.* 36 at p.13.

[17]*Gov't. Ex.* 40.

[18]*Gov't. Ex.* 40.

ROA.1066-1068.  PayPal records also included a portion of a passport bearing a photograph, issued in the name of Jeffrey Ndungi Sila, and with a birth date of January 27, 1985.[19]  ROA.1058-1059.

On cross-examination, the defense established that anyone can open a PayPal account online with a first and last name, an email address, a phone number, and a physical address–no additional identification documents are required.  ROA.1074-1075.  The defense established that anyone with the login information could access anyone's PayPal account.  ROA.1075.  Anyone with the login information could have uploaded Mr. Sila's passport document and emailed it to PayPal.  ROA.1081.

The defense also demonstrated that Sila was not the sole user of the PayPal accounts–indeed, the accounts remained open and in use in 2016 and 2017. Particularly, the defense established that, following Mr. Sila's arrest on September 11, 2016, the gmail account records reflected that someone logged in on October 11, 2016, November 27, 2016, and December 14, 2016.[20]  ROA.1077, 1080.  On November 27, 2016, Erick Muriuki was added as an address associated with the

---

[19] *Gov't. Ex.* 39.

[20] *Gov't. Ex.* 36.

account.[21] ROA.1077-1080. Someone logged into the hotmail account on February 19, 2017, and March 27, 2019.[22] ROA.1081-1082.

### 2)   *IP Address 41.215.78.139*.

IP address was owned by AccessKenya Group, Ltd., an Internet Service Provider located in Nairobi, Kenya, and it was leased to Enterprise ICT (Fiber) from 2011 to 2016, when the link was terminated.[23] ROA.1099-1100. On September 10, 2012, an invoice from AccessKenya was mailed to Enterprise ICT at Post Office Box 51668, Vision Plaza, Ground Floor, Room 14, Mesa Road, Nairobi.[24] ROA.1119. Vision Plaza is a mall in Nairobi which houses hundreds of businesses.[25] ROA.1119, 1130. Araceli Lagos, an IRS computer specialist, saw the same address listed several times in the PayPal records. ROA.1126, 1132. Lagos did not know whether the post office box was a physical or a shipping address. ROA.1126, 1132. She did not know whether the post office box was a central depository for mail for every business at the mall. ROA.1136. Case agent Tenesha Manning, however, was familiar with Kenya's

---

[21]*Gov't. Ex*. 36.

[22]*Gov't. Ex*. 40 at p.9.

[23]*Def. Ex*.1.

[24]*Def. Ex*. 2.

[25]*Def. Ex*. 5.

mail system.  ROA.1186.  Unlike the mail system in the United States, mail in Kenya is not delivered to individual addresses–people use post office boxes housed at central locations.  ROA.1186-1187.

Lagos had not contacted Enterprise ICT to see what kind of client it was, but was described as an Internet café.  ROA.1139.  Agent Manning testified that noone from the Government traveled to Kenya to see what sort of setup was there, or who was operating it.  ROA.1186.

As to the dates and times that the D.E. and C.D. electronic returns were electronically filed, Lagos explained that more than one person could have been logged onto internet at the same time through IP address 41.215.78.139.  ROA.1115-1116.  Lagos explained that Kenya does not have as many IP addresses assigned to it as does the United States.  ROA.1134.  She explained that anyone in the mall who logged onto Enterprise ICT's public network would have the same IP address.  ROA.1120, 1136-1137.  She further explained that, on a public network, there is no limit to the number of users would might be connected to the internet at the same time through the same IP address.  ROA.1109, 1112, 1116.

**B.    The Standard Of Review.**

Because Sila moved for judgment of acquittal at the close of the Government's case, and at the conclusion of all the evidence, review is *de novo*.  *United States v.*

*Waguespack*, 935 F.3d 322 (5th Cir. 2019) (citing *United States v. Hoffman*, 901 F.3d 523, 541 (5th Cir. 2018)((as revised Aug. 28, 2018)).   A jury's verdict will be affirmed unless no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.   *Id*.

### C.    Argument and Authorities.

To prove that Mr. Sila aided and abetted the theft of the D.E. tax refund, the Government had to prove beyond a reasonable doubt that he "associate[d] with the criminal activity, participate[d] in it, and act[ed] to help it succeed." *United States v. Martinez,* 921 F.3d 472 (5th Cir. 2019)(quoting *United States v. Delagarza-Villarreal*, 141 F.3d 133, 140 (5th Cir. 1997)).   The Supreme Court explains that, "those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime." *Rosemond v. United States*, 572 U.S. 66, 71 (2014)(quoting *Central Bank of Denver, N.A. vs. First Interstate Bank of Denver, N.A.* 511 U.S. 164, 181 (1994)). To satisfy the intent requirement, the Government must prove that the person actively participated in a criminal venture with "full knowledge of the circumstances constituting the charged offense." *Rosemond,* 572 U.S. at 76.   The Government may, of course, establish any element of an offense through circumstantial evidence. *United States v. Gangi*, 880

F.3d 760, 767 (5th Cir. 2018) (citing *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014)).

### 1)    *What Did The Government's Evidence Show?*

As described above, the evidence showed that the D.E. tax refund was electronically filed from IP address 41.215.78.139 on March 25, 2012.  In 2012, the IP address was leased to Enterprise ICT (Fiber) which listed its address at Post Office Box 51668 inside a large mall in Nairobi, Kenya.  The IP address was frequently used to log into Sila's gmail and hotmail PayPal accounts.  Both the D.E. and the C.D. tax refunds were electronically deposited into Lydia Breaux's Rosmerta Trucking bank account on April 4, 2012.  On April 12, 2012, Breaux wired more than $9,000 to Edwin Sila.  The Government showed no more.

The Government offered no evidence as to the nature of Enterprise ICT,  who owned it, or who worked there.  The Government introduced Mr. Sila's passport, issued in June of 2012, which showed that he frequently traveled internationally.[26] ROA.1172.  The Government made no effort, however, to show that Sila was even in Kenya–let alone at either Enterprise ICT or Vision Mall–on March 22 or March 25, 2012–the dates the returns were filed.  Tacitly recognizing the gaps in its proof, the Government sought to fill them in through argument:

------

[26]*Gov't. Ex.* 39.

> I submit to you that ICT Enterprises is his business, Edwin's business, in that building and had been there for years. That's where the criminal enterprise originates. That's where the tax returns are filed.

ROA.1274. Counsel's "no evidence" objection was overruled. ROA.1274. Acknowledging that it could not prove whether the IP address was available only to Enterprise ICT or to the whole building, the Government argued that, since both the D.E. and C.D. tax returns were electronically filed from same t1274.he building, "it's also reasonable to assume that the defendant filed it."[27] ROA.1274. The Government's evidence permitted no such inference–that the returns were filed three days apart from the same IP address, stated identical refund amounts, and contained the same bank account information to Breaux's Dallas bank account could, at best, supported an inference that both returns were fraudulent. But the fact that fraudulent returns may have been filed from the same IP address more times does not support an inference the Sila was the filer.

The difficulties inherent in trying to link an IP address to a particular individual was cogently explained in a copyright infringement case:

---

[27]If Enterprise ICT (Fiber) were Edwin's business, then it is unsurprising that Sila would use the post office box as a mailing address, or would spend time on its public network.

> **Although copyright owners can often trace infringement of copyrighted material to an IP address, it is not always easy to pinpoint the particular individual or device engaged in the infringement**.  Internet providers, such as Comcast or AT&T, can go so far as to identify the individual who is registered to a particular IP address (i.e., an account holder) and the physical address associated with the account, but that connection does not mean that the internet subscriber is also the infringer.  The reasons are obvious–simply establishing an account does not mean the subscriber is even accessing the internet, and multiple devices can access the internet under the same IP address.  **Identifying an infringer becomes even more difficult in instances like this one, where numerous people live in and visit a facility that uses the same internet service**.

*Cobbler Nevada, LLC v. Gonzalez*, 901 F.3d 1142, 1146 (D. Nev. 2018) (emphasis added); *see also United States v. McClellan*, 792 F.3d 200, 214 (1st Cir. 2015).

   In criminal cases, a linkage issue arises frequently in child pornography computer download cases where more than one person has access to a computer containing the unlawful images.  The First Circuit's decision in *United States v. Pothier*, 919 F.3d 143 (1st Cir. 2019) is particularly helpful.   There, police learned that someone using an IP address registered to Pothier at an apartment in Exeter, New Hampshire, downloaded child pornography from a peer-to-peer file-sharing network. *Id*. at 144.  In addition to Pothier, two other people–Pritchard and Balis–received mail at the residence.  *Id*.  In the search of the apartment, police found an Asus laptop computer which Pothier admitted was his. *Id*. at 145.  It was not password protected.

*Id*. Police found images of child pornography on the computer, along with programs found in child pornography cases. *Id*. The Government was able to pin down the exact times and dates of the illicit downloads. *Id*. Pothier was convicted of knowing possession child pornography. *Id*. at 144.

The First Circuit found the evidence to support Pothies guilt insufficient. *Id*. at 146. The Court noted that the laptop was not password-protected, and was found in a common area of the residence accessible to Pothier, Pritchard, and Balis–but this proved little beyond this. *Id*. at 146. There was evidence that Balis received mail at the apartment, but no evidence that he lived there, spent time there, or was there when child pornography was downloaded. *Id*. Pritchard was Pothier's "significant other." *Id*. She showed up during the search but did not speak to police. *Id*. Evidence regarding Pothier was also "remarkably scant." *Id.* The evidence showed that he worked for the Federal Aviation Administration and spent at least four days a month in New York where he maintained an apartment. *Id*. He owned property in New Hampshire, and his vehicle was registered there. *Id*. Pothier received some–but not all–of his mail at the apartment where it would sometimes sit in the mailbox for days. *Id*. There was no evidence to show whether Pothier left the Asus laptop at the apartment when he was elsewhere. *Id.* at 146-47. Though the Government knew the dates and times that child pornography was downloaded, it neither investigated nor

tried to prove where Pothier was on those dates and times. *Id*. at 147. The Government's sole theory was that Pothier must have known that there was child pornography on his laptop because he was the only person who used the laptop, and therefore he must have downloaded the child pornography. *Id.*

The Court posited a contrary scenario–that Pritchard or Balis used the readily available laptop during Pothier's frequent absences to download the child pornography and other applications. *Id*. The Court concluded that, "[e]ach scenario is plausible, and though one might debate their relative merits, to settle on one beyond a reasonable doubt would require guesswork." *Id*.

This Court, too, has found insufficient evidence to support a defendant's conviction for knowing possession of child pornography where three persons in the residence had free access to computers containing illicit images, which were not password protected. *United States v. Moreland,* 665 F.3d 137, 150 (5th Cir. 2011) (joint occupancy of a premises, without more, was insufficient, to prove that the defendant was in constructive possession or control of the contraband); *accord United States v. Lowe*, 795 F.3d 519 (6th Cir. 2015).

**2)** ***Concert of Action In A Criminal Enterprise As A Basis To Prove That Mr. Sila Was The Filer.***

Acknowledging that numerous people could have been using IP address 41.215.78.139 at the time the D.E. tax return was electronically filed, the Government argued that the jury could find that Mr. Sila filed the D.E. return based on a pattern of conduct:

> Count 3 is also very important. **Count 3 helps show this pattern, right, of Mr. Sila**. And we got into a huge discussion about the IP addresses and whether or not it could be multiple people using that specific IP address or not.
>
> *       *       *
>
> Now in this instance, **and why we can link this [the D.E. tax return] back to Mr. Sila, is this wasn't a check that was submitted by the government, it was a direct deposit**. And where do you think that direct deposit for that 1040 that was submitting from the same IP address that Mr. Sila was using for his PayPal, where do you think that money went to? **It went to, again, Lydia Breaux's bank account here in Dallas. The person that Mr Sila was with [in Dallas in August of 2016]**. That person that Mr. Sila was using to send an image from his phone to Lydia, to the undercover agent. Again, **it's that pattern to create that separation**.
>
> And what do we see **after Lydia Breaux gets that money? She immediately sends that money** to another bank in Kenya belonging **to Mr. Sila's brother, Edwin Sila. So again, there's that pattern**. (Emphasis added).

ROA.1244-45. And, the Government continued, this "pattern: was also sufficient to show Sila's criminal intent:

42

And . . . . when you look at the entire picture, **when you look at the connections between Counts 1, Counts 2 and Counts 3, you are not only able to see that pattern, but you are able to see Mr. Sila's intent**, this concept of creating that distance and allowing someone else to take the fall.  (Emphasis added).

ROA.1246.

The Government's contention that the evidence showed a pattern between the sale of the C.S. Treasury check charged in Count One–where there was clear and direct evidence that Sila, his brother Edwin, and Breaux acted in concert–and the theft of the D.E. tax refund occurring more than four years earlier, is unsupported by the evidence.  That Sila engaged in criminal conduct with his brother and Breaux in 2016, does not prove that he electronically filed the D.E. tax return in 2012, under the facts here.  The Government produced no evidence that Sila knew Lydia Breaux prior to 2016, had any contact with her prior to 2016, or even knew that she existed prior to 2016.  The Government produced no evidence that Sila ever sent money or goods to Breaux, or received money or goods from Breaux from the PayPal accounts.  The Government produced no evidence that Sila ever received money from Breaux, personally or through her bank account.  The Government produced no evidence that Sila was aware that his brother received proceeds from the D.E. refund

from Breaux's bank account. The Government produced no evidence that Sila shared in the proceeds of the tax refund, or that he was paid by his brother.

### 3)     *The Government's Evidence Was Legally Insufficient.*

This Court views the evidence in the light most favorable to the verdict in determining a sufficiency challenge, but "consider[s] countervailing evidence as well as the evidence that supports the verdict". *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 2008)(quoting *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007)).  While a jury may make factually-base inferences, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference upon inference." *United States v. Rojas-Alvarez*, 451 F.3d 320, 333 (5th Cir. 2006) (quoting *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996); *accord United States v. Martinez*, 921 F.3d 452, 466 (5th Cir. 2019).  This Court explains that no reasonable jury could find a defendant guilty of an offense where the "evidence gives equal or nearly equal circumstantial support to a theory of guilt, as well as to a theory of innocence."  *United States v. Moreland*, 665 F.3d at 149 (quoting *United States v. Ferguson*, 211 F.3d 878, 882-83 (5th Cir. 2001)).

Here, the Government asked the jury to infer that Sila electronically filed the D.E. tax return because he frequently accessed PayPal through IP address 41.215.78.139.  Although the Government did not establish that Sila had any

44

communications or contacts with Breaux or his brother prior to 2016, it asked the jury to infer that, because he engaged in criminal conduct with them in August of 2016, he acted in concert with them four years earlier. Based on this inference, the Government asked the jury further to infer that Sila not only filed the D.E. tax return, but did so knowing that the return was fraudulent, and with the intent to participate in their venture.

Because the inferences relied on by the Government are too attenuated from the factual record, and are stacked one upon the other, Sila's conviction of Count Three must be vacated.

## IV.

## THE TRIAL COURT REVERSIBLY ERRED IN DETERMINING SILA'S GUIDELINE RANGE BECAUSE ITS DETERMINATION OF LOSS UNDER U.S.S.G. § 2B1.1 WAS CLEARLY ERRONEOUS.

### A.    Pertinent Facts.

#### 1)    *The Offense Conduct For Counts One And Two.*

The Presentence Report sets out the Offense Conduct pertaining to Counts One and Two in Paragraphs 15-22. ROA.1460-1462. Much of the information contained in these paragraphs was admitted at trial and is already set out in the briefing.

Outside the trial evidence, the Presentence Report states at paragraph 15 that Breaux informed the undercover agent that she had been negotiating checks for

45

Edwin Sila since 2010, using her Citibank account.  ROA.1460.  Breaux told the

agent that it was Edwin Sila "who filed the returns and was in possession of the

names and social security numbers."  ROA.1460.  Breaux made no representations

about Sila prior to the summer of 2016, regarding the sale of the C.S. Treasury check.

ROA.1460.

In Paragraph 18, as at trial, the C.S. Short tax refund check was generated from

an electronic return, filed from IP address: 196.207.16.154, in Kenya.  ROA.1461.

> **2)** ***The Basis Of The Loss Computations For Counts One And Two***.

Paragraph 21 contains information pertaining to IP address 196.207.16.154

which was **not** admitted at trial, but which was used as the basis for the Probation

Officer's loss computation.  The report states that:

1.    Following Sila's arrest, his cell phone was searched  and
it contained two images of IRS letters dated November 9,
2015, in the name of Gladys W. Kariuki.

2.    The agent later learned that a fraudulent 2014 tax return
in the name of Ms. Kariuki had been electronically filed
from IP address 196.207.16.154, and claimed a $72,507
refund.

3.    Investigation of all tax returns electronically filed from IP
196.207.16.154 reflected that "multiple returns" listed J.P.
Morgan Chase Bank accounts . . . . in the name of Forrest
C. Reeves.

4.     The search of Sila's phone following his arrest revealed two PayPal accounts.

5.     An undescribed account in Reeves's name was linked to Sila's PayPal account (though it does not say which one).

6.     IRS records reflect that "multiple refunds" generated from fraudulent tax returns electronically filed from IP 169.207.16.154 were deposited into Reeves's account.

7.     A review of Reeve's account records showed "multiple transactions of $5,000" wired into Sila's PayPal account monthly until all the funds deposited from the refunds were depleted from Reeves's bank account.

ROA.1462.

The basis for the Probation Officer's loss computation for Counts One and Two is set out in Paragraph 22.  ROA.1462.  In paragraph 24, the report states that 213 fraudulent tax returns were electronically filed from IP address 169.207.16.154. ROA.1462.  The refunds from these returns resulted in an aggregate intended loss of $3,922.329.  ROA.1462.  Paragraph 23 states that "[s]ubpoenaed documents from PayPal revealed that Mr. Sila "used IP address 196.207.16.154 to log into his PayPal account from 2011 until 2016."  ROA.1462.

### 3)     *Basis For The Loss Computation Pertaining To Count Three.*

Paragraphs 23 and 24 set out the factual basis for the loss computation pertinent to Count Three consistent with the trial evidence.  ROA.1462.

47

Paragraph 24 states that IRS records revealed that 105 tax returns were electronically filed using IP address 41.215.78.139–the IP address frequently seen in the login records from PayPal. ROA.1462. At trial, *Government's Exhibit* 31 showed only two returns electronically filed from that address. According to the Probation Officer, the 105 returns resulted in an aggregate intended loss of $1,023,588. ROA.1462.

### 4)    *The Loss Computation.*

In Paragraph 26, the Probation Officer concluded that Sila was responsible for a total intended loss of $4,945,917 based on all 213 fraudulent tax returns electronically filed from IP address 169.207.16.154, and all 105 fraudulent tax returns electronically filed from IP address 41.215.78.139. ROA.1463.

### 5)    *The Guideline Computations.*

In paragraph 36, the Probation Officer calculated a Base Offense Level of Level 6, pursuant to U.S.S.G. § 2B1.1. ROA.1464. In paragraph 37, the Probation Officer added 18 levels for an intended loss of $4,945,917, under U.S.S.G. § 2B1.1(b)(1)(J). ROA.1464. In paragraph 38, the Probation Officer added 2 levels under U.S.S.G. § 2B1.1(b)(10)(B), because "a substantial part of the scheme was committed outside the United States". ROA.1464. Paragraph 46 sets out a Total Offense Level of Level 26. ROA.1465. Paragraph 50 stated that Sila had no prior

convictions and was in Criminal History Category I.  ROA.1466.  With no other adjustments, under paragraph 78, this resulted in a Guideline Range of 63 to 78 months for Mr. Sila's convictions of Counts One and Three.  ROA.1470.  Sila's conviction of Count Two for Aggravated Identity Theft mandated a 24-month terms of imprisonment, to be served consecutively.  ROA.1470.

### 6) *The Parties's Written Responses*.

Sila represented himself at sentencing.  Prior to sentencing, he filed written objections to the loss computation based on all 213 fraudulent tax returns filed through IP address 196.207.16.154.  ROA.553, 1513, 1516-1517.  Sila pointed out that the only evidence linking him to this IP address was evidence that the C.S. fraudulent tax return, the subject of Count One, was filed from that IP address.  ROA.553.  Sila explained that this IP address belonged to an internet café, frequented by thousands of people.  ROA.553.  Sila argued that he should not be held accountable for every tax return filed from the internet café.  ROA.553.

In response, the Government argued that Sila should be accountable for all intended loss related to the 213 because the number of returns was reasonably foreseeable to him, and because "he also had direct involvement with **at least some** of the returns (emphasis added)."  ROA.1496-1497.  Based on the two letters from the IRS regarding Gladys Kariuki found on Sila's cell phone–and evidence that a

fraudulent tax return had been filed in her name in 2015 from IP address 196.207.16.154–the Government argued that Sila "was clearly engaged in the joint scheme that used IP address 196.207.16.154 before the August 9, 2016, undercover sale of the Treasury check." ROA.1497. Further, the Government argued, Sila directly benefitted from the proceeds of "multiple" false tax returns filed from IP address 196.207.16.154 which flowed to him through the Forrest Reeves bank accounts. ROA.1497.

### 7)   *The Sentencing Hearing.*

At sentencing, Sila again objected to attribution of $3.9 million in intended losses to him based on all 213 tax returns electronically filed under IP address 196.207.16.154 under U.S.S.G. § 1B1.3 on the ground that these were not within the scope of his agreement. ROA.1371-1372, 1374-1376. In allocution, Sila told the Court that he hoped he would "not be held accountable for my brother, his actions, when I had nothing to do with them." ROA.1385.

As in its written response, the Government argued that all losses based on all 213 tax returns were reasonably foreseeable to Sila, and that Sila directly benefitted from "a number of returns" derived from the Forrest Reeves bank account, and he had access to others. ROA.1372-1374.

**8)    *The Court's Findings*.**

The Court denied Sila's objection to the $3.9 million loss computation based on the prosecutor's statements "about how the IP address and all of this is connected," and "on the evidence at trial." ROA.1376. The Court adopted the Presentence Report, its Addendum, and its findings and conclusions. ROA.1398, 1654.

**B.    Standard Of Review.**

A district court's interpretation and application of the Guidelines is reviewed *de novo*; the court's factual findings are reviewed for clear error. *United States v. Castillo*, 732 FED. APP'X. 267, 268 (5th Cir. 2018) (citing *United States v. Torres*, 843 F.3d 203, 207 (5th Cir. 2016).

**C.    Argument and Authorities.**

U.S.S.G. § 1B1.3 provides in pertinent part that the base offense level shall . . . . .

> (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were–
>
>> (i)    within the scope of jointly undertaken criminal activity,
>>
>> (ii)    in furtherance of that criminal activity, and

51

> > (iii)    reasonably foreseeable in connection with that criminal activity

> that occurred during the commission of the offense of conviction, preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . .

Effective November 1, 2015, U.S.S.G. § 1B1.3 was amended to clarify the reach of joint and several liability for sentencing purposes. U.S.S.G. § 1B1.3, Application Note 3. As stated by the United States Sentencing Commission, the purpose of the changes, was to clarify the reach of relevant conduct principles in offenses involving multiple participants because determination of what constitutes joint and several liability for sentencing purposes is often confusing. *Id.*

Under Application Note 3(A), a court must apply a three-step analysis in determining whether a defendant is accountable for the conduct of others in jointly undertaken criminal activity. The court must determine whether the acts and omissions of others were:

> (i)    within the scope of the jointly undertaken  criminal activity;

> (ii)    in furtherance of that criminal activity; and,

> (iii)    reasonably foreseeable in connection with that criminal activity.

The conduct of others must meets all three criteria in order to constitute "relevant conduct" for sentencing purposes. *Id*.

Application Note 3(B), explains that "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy," and "relevant conduct is not necessarily the same for every participant." To make this determination, the court must "**first determine the scope** of the criminal activity **the particular defendant agreed to jointly undertake**–that is, "the scope of the specific conduct and objectives embraced by the defendant's agreement." *Id*. (emphasis added). The accountability of the defendant for the acts of others "is limited by the scope of his or her agreement to jointly undertake **the particular criminal activity**." *Id*. (emphasis added). Acts of others not within the scope of the defendant's agreement–"even if known or reasonably foreseeable to the defendant"–are not relevant conduct. *Id*.

The scope of jointly undertaken criminal activity depends on the particular circumstances of the case–a court must determine whether the nature of the offense is more appropriately viewed as one joint undertaken criminal activity, or as a number of separate criminal activities. *Id*. A defendant's relevant conduct does not include the conduct of members of a conspiracy **prior to** the defendant joining the conspiracy, even if the defendant knew of that conduct. *Id*. The court must determine

the scope of the defendant's agreement before determining whether the conduct of others was in furtherance of the jointly undertaken criminal activity.  U.S.S.G. § 1B1.3, Application Note 3©.  Only after these determinations have been can the court determine if the conduct of others was within the scope and in furtherance of "the jointly undertaken criminal activity was reasonably foreseeable in connection with that criminal activity."  *Id*. at Application Note (D).

In this case, the trial court did not conduct the necessary three-step inquiry to determine whether Sila should be held jointly accountable for all intended losses from fraudulent tax returns electronically filed from IP address 196.207.16.154.  Granted, there is a limited record here.  The trial record reflects that the IRS was investigating "a large stolen identity tax refund scheme" orchestrated by "persons in Kenya."[28] ROA.1460.   The scheme involved the electronic filing of "thousands of fraudulent income tax returns from IP addresses mostly in Kenya." ROA.1460.  But knowledge as to the extent and scope of the scheme, the number of participants, and whether there was one or multiple schemes is beyond any evidence in the record.

The Presentence Report reflects that Lydia Breaux was engaged in an ongoing scheme with Edwin Sila, beginning in 2010.[29] ROA.1460.  Breaux apparently did not

---

[28]PSR at ¶ 14.

[29]PSR at ¶ 15.

54

inform the agent that she had engaged in a scheme with Sila prior to the summer of 2016, and related solely to the C.S. Treasury check which was the subject of Count One.[30] ROA.1460.

The record evidence established that the C.S. check derived from a fraudulent tax return electronically filed from IP address 196.207.16.154.[31] ROA.1461. The Probation Officer informed the court that "[s]ubpoenaed documents from PayPal revealed that Jeffrey Sila used IP address 196.207.16.154 to login to his PayPal account from 2011 until 2016.[32] ROA.1462. But the Probation Officer's statement is wrong–*Government's Exhibits* 36 and 40 are the records of Sila's PayPal account, to include every IP address used to login to each account.[33] ROA.1446. These records reflect that IP address 196.207.16.154 was **<u>never</u>** used to login to either PayPal account. ROA.1446.

As for the representation in the Presentence Report at paragraph 21, that Sila received money derived from fraudulent tax returns filed from IP address 196.207.16.154, crucial details are lacking. ROA.1462. According to the Report,

_____

[30]PSR at ¶ 15.

[31]PSR at ¶ 18.

[32]PSR at ¶ 23.

[33]These records are included in the Record Excerpts.

55

refunds from an unknown number of tax returns filed from IP address 196.207.16.154 were deposited into a bank account owned by Forrest Reeves. ROA.1462. The Report states that, on "multiple occasions," $5,000 deposits were made from the Reeves account into one of Sila's PayPal accounts. ROA.1462. At trial, there was no evidence about Reeves, let alone his relationship to anyone in the case, any bank accounts in his name, any tax refunds deposited there, how many tax refunds were deposited there, and how many deposits, if any, were made from the Reeves account to Sila's account. Nor is there information as to how much money was deposited into Sila's PayPal account, or over what period of time. Examination of PayPal's records reflect no bank account information linked to the Reeves accounts described in the Report, and no regular $5,000 monthly deposits.

In Point III, Sila argues that the evidence was insufficient to establish that he electronically filed the fraudulent D.E. tax return in 2012, from IP address 41.215.78.139. If the evidence in support of Count Three is insufficient, then the very earliest that Sila is linked to IP address 196.207.16.154 is 2015, when the Gladys Kariuki fraudulent return was filed.[34] ROA.1462. We contend that Sila, contrary to the position of the Probation Officer,[35] cannot be accountable at sentencing for losses

---

[34] PSR at ¶ 21.

[35] PSR at ¶ 26.

associated from IP address 196.207.16.154 from 2011 until 2016 based upon all the evidence before the Court.  ROA.1463.

### D.    In Sum.

The trial court's fact finding–that Sila was jointly and severally liable for $3.9 million in intended tax losses to the United States–was based on factually incorrect, and factually inadequate information and, thus, is clear error. *United States v. Gentry*, 941 F.3d 767, 788 (5th Cir. 2019) ("Sentences based upon erroneous and material information or assumptions violate due process."); *United States v. Zuniga*, 720 F.3d 587, 591 (5th Cir. 2013) ("If the factual recitation in the PSR lacks sufficient indicia of reliability, then it is error for the district court to consider it at sentencing."). Additionally, the court did not engage in the three-step inquiry required under U.S.S.G. § 3B1.1, Application Note 3, to determine relevant conduct in determining loss under U.S.S.G. § 2B1.1. Because the court's loss determination was based on a clearly erroneous factual basis, Silas's case should be remanded for a new sentencing hearing.

### PRAYER

FOR ALL OF THESE REASONS, JEFFREY NDUNGI SILA respectfully prays that this Court will reverse his convictions and afford him a new sentencing hearing.

Respectfully submitted,

*s/*   Nancy B. Barohn

NANCY B. BAROHN
405 South Presa
San Antonio, Texas 78205
(913) 302-6708
Texas Bar Number: 01796500
nbb@airmail.net

*Attorney for Mr. Jeffrey Ndungi Sila*,
*Defendant-Appellant*

## CERTIFICATE OF SERVICE

I certify that I served a true and correct copy of Mr. Jeffrey Ndungi Sila's

Opening Brief through the ECF filing system on:

Ms. Amber Grand
United States Attorney's Office
Appellate Section
U.S. Attorney's Office for the
Northern District of Texas
1100 Commerce Street, Suite 300
Dallas, Texas 75242-1699
Amber.grand@usdoj.gov

– on this the ____25th____ day of November, 2019.

*s/*   Nancy B. Barohn

NANCY B. BAROHN
*Attorney for Mr. Jeffrey Ndungi Sila*

58

# CERTIFICATE OF COMPLIANCE

1.    Mr. Jeffrey Ndungi Sila's opening brief complies with the type-volume

limitation of FED.R.APP.P. 32(a)(7) because:

>    The brief contains 12,963 words, exclusive of the tables and
>    certificates.

2.    The brief complies with the typeface requirements of FED.R.APP.P. 32(a) and

the type style requirements of FED.R.APP.P. 32(a) because:

>    This brief has been prepared in a proportionally spaced
>    typeface using Word Perfect X-5, in 14-point Times New
>    Roman style.  Footnotes are in 13-point Times New Roman
>    style.

DATED:  November 25, 2019.

>    /s/   NANCY B. BAROHN
>    NANCY B. BAROHN
>    *Attorney for Mr. Jeffrey Ndungi Sila*

A-1